UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
CLASSIFIC MEDIA, LLC,

                         Plaintiff,

VS.

J.G. WENTWORTH, LLC,
KARLIN + PIMSLER, INC.,

                         Defendants.

------------------------------------------------------------X

JUDGE KAPLAN

11 CIV 8394

**COMPLAINT**

**JURY TRIAL DEMANDED**

## JURISDICTION AND VENUE

1. This action arises under the Copyright Laws of the United States, as hereinafter more fully appear. Jurisdiction is conferred on this Court by 28 U.S.C. § 1338.

2. This Court has personal jurisdiction over the Defendants under New York C.P.L.R. §§ 301, 302(a)(1) by virtue of their transacting, doing, and soliciting business in this District.

3. Venue is proper under 28 U.S.C. § 1391(b), as a substantial part of the events and/or omissions that gave rise to the Plaintiff's claim occurred in this District.

## THE PARTIES

4. Plaintiff, Classic Media, LLC (hereinafter referred to as "Classic" or "Plaintiff") is a limited liability company incorporated under the laws of the state of Delaware with its principal place of business at 85 Fifth Avenue, New York, New York.

5. Upon information and belief, Defendant Karlin + Pimsler, Inc. (hereinafter referred to as "Karlin + Pimsler" and, collectively with Defendant J.G. Wentworth, the "Defendants") is a corporation incorporated under the laws of the State of New York with its principal place of business at 1375 Broadway, New York, New York.

6. Upon information and belief, Defendant J.G. Wentworth, LLC (hereinafter referred to as "J.G. Wentworth") is a limited liability company incorporated under the laws of the state of Delaware with its principal place of business at 201 King of Prussia Road, Radnor, Pennsylvania.

## CAUSE OF ACTION FOR FEDERAL COPYRIGHT INFRINGEMENT

*I. Lassie and Plaintiff's Related Copyrights*

7. Classic is the sole owner and proprietor of copyrights related to the famous fictional collie dog character known as "Lassie"—the star of eleven feature films and several television shows, most notably the first *Lassie* series (hereinafter "*Lassie*" or the "Program") that originally ran from 1954 until 1973 and is still in syndication to this date. Hereinafter, all copyrights related to the Lassie character are collectively referred to as the "Property."

8. Along with the title character, *Lassie* featured numerous other characters, including the fictional Martin family—Paul, his wife, Ruth, and Timmy, Ruth's son—Lassie's owners who lived with the dog on their family farm. All characters appearing in or otherwise related to the Property are hereinafter collectively referred to as the "Characters."

9. In the Program's most famous and memorable recurring storyline, the Characters, particularly Timmy Martin, find themselves in some sort of peril. In each instance, the Characters send Lassie to get help from others. During her search, Lassie is shown running through a field, forest, or other rural area until she finds humans who can save her companions. Lassie is then always shown barking at the humans to get their attention. Sensing Lassie's barks mean that someone is in trouble, the humans ask Lassie to lead them to the site of peril. Lassie is then shown leading the humans to her companions and their eventual rescue.

10. The Characters from the Program, including, but not limited to, Lassie, Timmy and Ruth, have become famous and an integral part of American popular culture.

11. Plaintiff is in receipt from the U.S. Register of Copyrights approximately twelve hundred (1,200) registrations, of which approximately one thousand (1,000) relate specifically to television episodes of the Property.

12. Classic is a global media company with a large portfolio of some of the world's leading family and pop-culture entertainment brands. Classic produces programming content in several genres, including television programming. Classic has interests in several subsidiaries and joint ventures.

13. Plaintiff and/or its predecessors in interest have complied in all respects with Title 17 of the United States Code and all other laws governing copyright, and have secured and maintained the exclusive rights and privileges in and to the Property.

14. Over the last several decades, Plaintiff and/or their predecessors in interest have exploited the Property through program sales and numerous licensing programs, including, but not limited to, the sale of dog products, t-shirts, hats, sweatshirts, calendars, greeting cards, posters, toys, mugs and books.

15. Plaintiff has also licensed the Property to third parties for their use of the characters in television advertisements. The Property is so valuable that Classic has been able to collect

2

more than one million dollars ($1,000,000) in licensing fees for the Property's use in just one television commercial.

*II. Defendants' Unauthorized Use of the Property*

16. Upon information and belief, Defendant J.G. Wentworth is a financial services company whose primary business is purchasing customers' annuities and structured settlements from in exchange for a lump-sum payment to the customer.

17. Upon further information and belief, J.G. Wentworth holds more than two billion dollars ($2,000,000,000) in annuities and structured settlements.

18. Upon information and belief, Defendant Karlin + Pimsler is an advertising agency that specializes in creating direct-response television advertisements for its clients.

19. Upon information and belief, Karlin + Pimsler has produced several of these television advertisements for J.G. Wentworth, including the Infringing Advertisement (defined below) that is at issue in this Complaint.

20. J.G. Wentworth has promoted its annuity- and structured settlement-buying business with dozens of nationally aired television commercials.

21. J.G. Wentworth has released, or caused to be accessible, its advertisements on its website, www.jgwentworth.com.

22. Karlin + Pimsler has released, or caused to be accessible, the advertisements it has produced for J.G. Wentworth on YouTube.com and its own website, www.karlinpimsler.com.

23. On or around December 28, 2009, Steve Pimsler, Karlin + Pimsler's then Vice President and Creative Director ("Pimsler"), contacted Christine Gorman, an employee in Plaintiff's licensing department ("Gorman"), to discuss licensing the Lassie character for a client of Karlin + Pimsler. Thereafter, on December 28, 2009, Pimsler sent Gorman an email in which Pimsler stated, among other things, that his company was "exploring an idea for a client of ours which would feature on a Lassie [sic]." Pimsler's December 28 email also notes that Pimsler wished to discuss with Gorman "how the rights for using Lassie can be licensed…"

24. Thereafter, Pimsler and Gorman exchanged emails and spoke over the phone about licensing the Lassie Property for a live-action commercial. On January 4, 2010, Pimsler sent Gorman an email in which he noted that "[o]ur idea is to set up a situation similar to the Lassie TV show; it would be set in farm house, with a mother and young son. The mother is in financial difficulty and the son sends Lassie to get help. Lassie runs through the hills and meadows and finally brings help in the person of our client's spokesperson."

25. At that time, Pimsler also explained the advertisement would be use to promote "a reputable financial instrument aimed at consumers." All of the emails Pimsler and Gorman

3

exchanged refer to Lassie in the subject line (i.e., "Lassie licensing" or simply "Lassie"). (Copies of the emails referenced are attached at Exhibit "A.")

26. After January 6, 2010, neither Gorman nor anyone else from Classic heard from or was contacted by Pimsler or anyone else from or representing either Karlin + Pimsler or J.G. Wentworth.

27. Upon information and belief, on or about March, 2010, J.G. Wentworth caused to be broadcast on television its Lassie-themed commercial alternately titled "Get Cash Now" and "Get Help Girl" (the "Infringing Advertisement").

28. Upon information and belief, soon thereafter, J.G. Wentworth displayed, or caused to be accessible, the Infringing Advertisement on its website. The Infringing Advertisement is no longer available for viewing on J.G. Wentworth's website, but can be accessed via the Internet Archive's "Wayback Machine" at www.archive.org.

29. Upon information and belief, soon after being broadcast on television, Karlin + Pimsler displayed, or caused to be accessible, the Infringing Advertisement on its website at www.karlinpimsler.com/pages/financial-services.html. The Infringing Advertisement is still available for viewing on Karlin + Pimsler's website, as well as on YouTube.com. Plaintiff asks this Court to take Judicial Notice under Fed.R.Evid. 201(b)(2) and (d) of the Infringing Advertisement published at www.karlinpimsler.com/pages/financial-services.html.

30. The Infringing Advertisement follows almost the exact same storyline as is described in ¶ 9 of this Complaint. The Infringing Advertisement begins by showing a young boy, similar in age and appearance to the famous Timmy character from *Lassie*, sitting at the table of a 1950s farmhouse-styled kitchen with his middle-aged mother. The mother is dressed in the contemporary fashion of a 1950's housewife and strongly resembles the famous Ruth Miller character from *Lassie*. The mother is then shown letting out a sigh of exasperation, which causes the boy to ask "Mom, what's wrong?", to which she replies "Oh, Eddie, we've got to come up with some money or we'll lose the ranch." After some banter about how the mother's structured-settlement payments are not enough to meet the family's needs, the young boy gets up from the table and approaches the family's collie dog—strikingly similar in appearance to Lassie—and says "We need cash now, girl. Go get help!"

31. Thereafter, the Infringing Advertisement shows the collie dog running through fields and farmland until she reaches the offices of J.G. Wentworth and finds the company's spokesman, who asks "What is it, girl?" The collie dog then barks at the spokesman, who, sensing something is wrong, gets up from his office chair to follow the dog. The spokesman and the collie dog are then shown exiting a black pickup truck in front of the farmhouse. The young boy then says "She's back. We're gonna get the money now!"—indicating the collie dog has rescued the family by seeking J.G. Wentworth's services.

32. Upon information and belief, J.G. Wentworth hired Karlin + Pimsler to produce the Infringing Advertisement, which Karlin + Pimsler thereafter did produce.

4

33. On or around June 29, 2011, Classic became aware that J.G. Wentworth had aired the Infringing Advertisement on national television broadcasts.

34. More recently, it came to the attention of Classic that J.G. Wentworth's Chief Marketing Officer gave a presentation during "Response Expo 2010"—an exposition for those in the direct-response marketing field. During the presentation, the Chief Marketing Officer displayed PowerPoint slides showing consumer responses to J.G. Wentworth's television advertisements. One such response says, "I saw your new commercial, with the theme of Lassie. It is an attention getter. People will be talking about that one." (A copy of the quoted PowerPoint slide is attached at Exhibit "B.")

35. The Infringing Advertisement is copied from and is a derivative work based on the Property.

36. Neither Classic nor any of its agents ever gave J.G. Wentworth or Karlin + Pimsler permission to copy or create any sort of derivative work based on the Property.

37. The Defendants willfully infringed Plaintiff's copyrights in the Property by creating, sanctioning and permitting such infringing advertisements to be broadcast to the public.

38. As a result of the conduct of the Defendants, Plaintiff has lost income and profits, which Plaintiff would have realized from the authorized use of Plaintiff's copyrights. Plaintiff is, therefore, entitled to actual damages and any additional profits of the infringers pursuant to 17 U.S.C. § 504(b).

**WHEREFORE**, Plaintiffs demand:

1. That Defendants, their agents, servants and assigns be enjoined during the pendency of this action, and permanently, from infringing said copyrights of said Plaintiff in any manner, and from broadcasting the Infringing Advertisement or any other advertisement that infringes the Plaintiff's exclusive rights to the Property.

2. That Defendants be required to pay to Plaintiff such damages—to be determined, but not less than one million dollars ($1,000,000)—as Plaintiff sustained in consequence of their infringements of said copyrights to account for all gains, profits and advantages derived by Defendants by their infringement of Plaintiff's copyrights or such damages as to the Court shall appear proper within the provisions of the Copyright statutes.

3. That Defendants be required to pay to Plaintiff the costs of this action and reasonable attorney's fees associated thereto pursuant to 17 U.S.C. § 505.

4. That Plaintiff has such other and further relief as the Court deems just and proper.

Dated: New York, New York
November 18, 2011

Respectfully submitted,

*Sonja Keith*

Sonja Keith, Esq. (0055)
Attorney for Plaintiff
c/o Classic Media, LLC
85 Fifth Avenue, 6th Floor
New York, NY 10003
(212) 659-1954

# EXHIBIT "A"

[ON PAGES FOLLOWING]

------ Forwarded Message
**From:** Steve Pimsler <spimsler@karlinpimsler.com>
**Date:** Mon, 28 Dec 2009 10:27:28 -0500
**To:** Christine Gorman <cg2@classicmedia.tv>
**Subject:** Lassie

Hi, Christine,

Thank you for returning my call last week. I left my office to go to an edit session and forgot to forward it. Please feel free to call my cell phone any time.

Karlin+Pimsler is a creative agency specializing in direct response TV commercials. (Please check out our web site: Karlinpimsler.com.) We are exploring an idea for a client of ours which would feature on a Lassie. What I would like to discuss with you is how the rights for using Lassie can be licensed, if licensing requires using a collie from the actual Lassie line and what the costs would be.

I look forward to speaking with you next week when you return to your office. Shall I call you on Monday or will you call me?

Happy Holidays.
Steve

PS I've attached our holiday card and hopefully you will get a chuckle out of it.


------ End of Forwarded Message

1

------ Forwarded Message
**From:** Christine Gorman <cg2@classicmedia.tv>
**Date:** Wed, 06 Jan 2010 11:51:33 -0500
**To:** Steve Pimsler <spimsler@karlinpimsler.com>
**Subject:** Re: LASSIE license/additional thought

Hi, Steve.
I received your message. I apologize for the delay in getting back to you. I am waiting to meet with our VP of Licensing about this, so that I can get back to you with more information. I will be in touch with you as soon as possible.

--c

**Christine Gorman**
Classic Media

85 Fifth Avenue, FL6
New York, NY 10003
T  212.659.3042
F  212.659.3041



---

**From:** Steve Pimsler <spimsler@karlinpimsler.com>
**Date:** Mon, 4 Jan 2010 14:26:35 -0500
**To:** Christine Gorman <cg2@classicmedia.tv>
**Subject:** LASSIE license/additional thought

Hi, Christine,

I left you a phone message but thought I'd follow up with an email just in case you get this first.

I'm wondering if we could also explore using an existing Lassie TV show which our production house could manipulate to our script. That way we wouldn't have to shoot anything and would probably save a huge amount of production money.

What do you think?

Steve

1

should respond to Steve.

Thanks!
--C

------ Forwarded Message
From: Steve Pimsler <spimsler@karlinpimsler.com>
Date: Mon, 4 Jan 2010 11:43:42 -0500
To: Christine Gorman <cg2@classicmedia.tv>
Subject: Lassie licensing

Hi, Christine,

It was a pleasure talking with you this morning.

Here is a brief synopsis of what Karlin+Pimsler would like to do for our client. We would be doing a :60 second direct response TV commercial that would primarily air on select national cable channels, local markets and per-inquiry buys. The product is a reputable financial instrument aimed at consumers. Our idea is to set up a situation similar to the Lassie TV show; it would be set in a farm house, with a mother and young son. The mother is in financial difficulty and the son sends Lassie to get help. Lassie runs through the hills and meadows and finally brings help in the person of our client's spokesperson.

We would like to know what is involved in licensing the Lassie name and character for this spot. Initially, the spot would be tested to see if it works. If it does work - meaning it generates a substantial response by phone - then it would roll out in the media I mentioned before. We would also be interested to know what the cost would be to use the collie from the Lassie line.

In the past, we have produced commercials for this client on very modest budgets, so we're hoping the licensing fees won't put us out of the ball park.

Thanks for your help.
Steve

Steve Pimsler
Creative Director
spimsler@karlinpimsler.com
212.779.3455 Office
914.552.1121 Mobile
Karlin+Pimsler
1375 Broadway, Suite 1400
NY NY 10018


------ End of Forwarded Message

2

# **EXHIBIT "B"**

[ON PAGES FOLLOWING]



# Welcome to Response Expo 2010

*Presented by*



**DRMA** — Direct *Response* Marketing **ALLIANCE**



*Response* Magazine

May 11-13, 2010

*Hilton San Diego Bayfront*



# DR Through Thick and Thin



**Noon-1 p.m.**

*Presented by*
**Ken Murray**
**Chief Marketing Officer, J.G. Wentworth**

*May 11-13, 2010*

*Hilton San Diego Bayfront*





Response Expo 2010

# First, some *Context*

May 11-13, 2010

Hilton San Diego Bayfront



# I know I've heard of you guys ...

## ... but what is it that you do?

# AND WHAT THE HELL IS A STRUCTURED SETTLEMENT?!

May 11-13, 2010

Hilton San Diego Bayfront



# Basics of the Business

Two distinct consumer products JGW purchases:

1. **Structured settlement payments** ($120 biillion market)
   - Payments from accident/injury settlement
   - Each transaction must be approved by a judge

2. **Investment annuity payments** ($2 trillion market)
   - Many annuities inherited
   - Tax complications for heirs

*Common denominator: Consumers who need cash*

*Payments are underwritten, securitized, AAA-rated bonds sold to institutional investors*

May 11-13, 2010

Hilton San Diego Bayfront



# Fan Mail (continued)

I SAW YOUR NEW COMMERCIAL, WITH THEME OF LASSIE. IT IS AN ATTENTION GETTER. PEOPLE WILL BE TALKING ABOUT THAT ONE. WHO KNOWS, YOU MAY WIN AN AWARD LATER FOR ORIGINAL AD COMM.
JUDY FROM N.C.

Dear J.G. Wentworth,

I wanted to email you about something funny that my 5 1/2 year old daughter did this morning. I walked into the room singing in my best opera voice "Call J. G. Wentworth" and she promptly tuned in singing "(877) CASH NOW!". Now that is good advertising! I thought it would bring a smile to your face because it did so for me.

Warmest regards,
Mark

May 11-13, 2010

Hilton San Diego Bayfront